UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

STATE OF NEW YORK, NEW YORK STATE
DEPARTMENT OF ENVIRONMENTAL
CONSERVATION, and BASIL SEGGOS, as
Commissioner of the New York State
Department of Environmental Conservation,

                              Plaintiffs,

                          v.

OUDERKIRK RTP, INC.,

                              Defendant.
_____

**COMPLAINT**

Case No. 1:21-cv-321 (MAD/CFH)

Plaintiffs State of New York, the New York State Department of Environmental Conservation (DEC), and Basil Seggos (Seggos), in his capacity as Commissioner of DEC (together, the State), by their attorney Letitia James, Attorney General of the State of New York, as and for their Complaint, allege as follows upon information and belief:

## NATURE OF THE ACTION

1.     This is an action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601-9675 (CERCLA), as amended, to recover costs that have been and will be incurred by the State in responding to the release and threatened release of hazardous substances into the environment at and from the premises located at 595 Columbia Turnpike, East Greenbush, New York (the Site).

2. This action seeks (a) recovery of the State's response costs incurred to date, and (b) a declaration of liability for the State's future response costs.

## JURISDICTION AND VENUE

3. This Court has exclusive jurisdiction over the Claim for Relief, which arises under the laws of the United States, pursuant to 28 U.S.C. §§ 1331 and 2201 and 42 U.S.C. §§ 9607 and 9613. The Court also has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

4. Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the release and threatened release of hazardous substances that give rise to this action occurred and/or are occurring within this District.

## THE PARTIES

5. Plaintiff State of New York, as a body politic and sovereign entity, brings this action to recover costs that have been and will be incurred by the State in responding to the release and threatened release of hazardous substances at and from the Site.

6. Plaintiff DEC is an executive agency of the State of New York and brings this action to recover costs that have been and will be incurred by DEC in responding to the release and threatened release of hazardous substances at and from the Site.

7. Plaintiff Seggos is the Commissioner of DEC and brings this action in his official capacity as Commissioner to recover costs that have been and will be

incurred by DEC in responding to the release and threatened release of hazardous substances at and from the Site.

8. Defendant Ouderkirk RTP, Inc. (Ouderkirk RTP) is a corporation organized under the laws of the State of New York.

## STATUTORY AND REGULATORY BACKGROUND

9. CERCLA provides that when there is a release or a threatened release of hazardous substances into the environment from a facility, certain categories of persons are liable to the State for the costs that the State incurs to respond to the release or threatened release as long as the State's response actions are "not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a).

10. "Hazardous substances" are defined in 42 U.S.C. § 9601(14) to include substances that the United States Environmental Protection Agency (EPA) has designated as hazardous pursuant to 42 U.S.C. § 9602. The substances that EPA has designated as hazardous are listed in 40 C.F.R. § 302.4.

11. A "release" includes spilling, leaching, and disposing "into the environment." *Id.* § 9601(22). The "environment" includes groundwater, land surface, and subsurface strata. *Id.* § 9601(8).

12. A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). It also includes buildings, structures, and equipment. *Id.*

13. The terms "respond" or "response" include taking "removal" actions, "remedial" actions, and related enforcement activities. *Id.* § 9601(25). A "removal"

action includes the "cleanup or removal of released hazardous substances from the environment" and the assessment and evaluation of a release. *Id.* § 9601(23). A "remedial" action means "those actions consistent with permanent remedy taken instead of or in addition to removal actions." *Id.* § 9601(24).

14. The "national contingency plan" is set forth in 40 C.F.R. Part 300.

15. The persons liable for response costs under 42 U.S.C. § 9607(a) include: (i) current owners and operators of a facility and (ii) owners and operators of a facility at the time of disposal of hazardous substances. "Persons" include individuals and corporations. 42 U.S.C. § 9601(21).

16. 42 U.S.C. § 9613(g)(2) provides that in an action for response costs, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding in any subsequent action or actions to recover further response costs or damages."

## FACTUAL ALLEGATIONS

### Site Overview

17. The Site is located at 595 Columbia Turnpike, Town of East Greenbush, Rensselaer County, New York (Tax Map/Parcel No.: 166.15-4-12) and is identified as DEC Site No. 442044.

18. The Site occupies approximately 0.42 acres of commercial enterprises and structures that were used for laundry and dry-cleaning services and other commercial uses since at least 1958.

19. The Site is immediately adjacent to commercial properties to the north, south, and east and to State Route 4, a public highway, to the west.

## Ownership of the Site from 1958 to Present

20. Ervin C. Ouderkirk and Helen M. Ouderkirk (Ouderkirks) owned the Site from 1958 to 1997.

21. The Ouderkirks ended their ownership of the Site in or around 1997 with the transfer of the real property to Ouderkirk RTP. Ouderkirk RTP is the current owner of the Site.

22. Ouderkirk RTP was incorporated under the laws of the State of New York on December 20, 1996 with a business address of 360 Clay Hill Road, Fort Ann, New York. The officer listed in the records of the Secretary of State was Eugene N. Ouderkirk as Chief Executive Officer. Eugene N. Ouderkirk died a resident of the State of New York on February 12, 2015. The records of the Secretary of State do not list successors to Eugene N. Ouderkirk as officer of Ouderkirk RTP.

## Operations at the Site from 1958 to Present

23. The Site has been used since 1958 as a commercial laundry and dry-cleaning establishment by a series of lessees.

24. In 1959, the Ouderkirks entered into a 99-year lease with Louis P. Arnos for the operation of a dry-cleaning business at the Site. The lease was periodically amended in 1960, 1961, 1965, and 1971.

25. The lease was assigned from Louis P. Arnos to Theonie Arnos by a written instrument dated April 7, 1971.

26. On February 24, 1972, Fashion Care Laundry & Cleaners Inc. (Fashion Care) was incorporated under the laws of the State of New York with the

5

Site as its business address and officers listed in the records by the Secretary of State as Theonie Arnos as Secretary, and Peter Arnos as Chief Executive Officer.

27. Upon information and belief, Theonie Arnos died in 1996, and Louis P. Arnos died in 1999.

28. The dry-cleaners' processes at the Site from 1958 to June 30, 2004 included the use of significant quantities of the solvent tetrachloroethylene (PCE)[1] as the cleaning agent in dry cleaning machines. The contaminants of concern at the Site include PCE and its breakdown products, trichloroethene trichloroethene (TCE), cis-1,2-dichlorothene(1,2 DCE), and vinyl chloride, which arise from dry cleaning activities and operations on the Site during this time period.

29. Dry-cleaning chemicals were disposed of, spilled, or leaked onto the Site during the dry-cleaning processes.

30. Those dry-cleaning chemicals contaminated the soil and groundwater on the Site and migrated off the Site. They also created contaminated soil vapor that caused indoor air contamination on and off the Site.

31. Ouderkirk RTP's lessees, Louis P. Arnos, Theonie Arnos, and Fashion Care, used an area of land adjacent to the main building at the Site for the storage and disposal of dry-cleaning chemicals, compounds, and supplies that contain PCE and other contaminants. These chemicals, compounds, and supplies were stored uncovered on the land surface. These chemicals, compounds, and supplies were

---

[1] PCE is also identified by the chemical names tetrachloroethene and perchloroethylene, and is often colloquially referred to as "perc."

6

disposed of on the land surface.

32. On July 1, 2004, New Fashion Care Laundry & Dry Cleaners Inc. (New Fashion) was incorporated under the laws of the State of New York with the Site as its business address and the officer listed in the records of the Secretary of State as Hyunshik Chun as Chief Executive Officer. New Fashion operates the dry-cleaning business at the Site as the current lessee. The chemical compounds used by New Fashion are not the source of the Site contamination.

### DEC's Investigation of the Site

33. On or about October 24, 2016, DEC initiated its remedial investigation of the Site.

34. DEC conducted a remedial investigation of the Site in two phases, phase one from March 2017 to September 2017 and phase two from June 2019 to October 2019. The purpose of the remedial investigation was to evaluate the nature and extent of soil, groundwater, soil vapor, and indoor air contamination at or emanating from the Site and to determine if they posed a threat to human health or the environment.

35. The DEC remedial investigation is on-going. DEC has not issued a remedial investigation report.

36. During soil borings performed as part of the remedial investigation, samples were analyzed and found to contain hazardous substances that exceeded DEC guidance levels.[2]

---

[2] Historically, DEC established "guidance levels" that set the cleanup limits

37. Hazardous substances detected in the soil excavated from the Site included PCE, TCE, 1,2-DCE, and vinyl chloride.

38. The presence of these hazardous substances, solvents and solvent byproducts that are commonly used during the dry-cleaning process, is consistent with use and operations on the Site by Ouderkirk RTP's lessees Louis P. Arnos, Theonie Arnos, and Fashion Care.

39. Under anaerobic conditions (i.e., no oxygen), chlorinated solvents, such as PCE, break down into byproducts. For example, PCE breaks down into TCE and 1,2-DCE.

40. EPA has designated PCE, TCE, and 1,2-DCE as hazardous. 40 C.F.R. § 302.4.

41. PCE is likely carcinogenic. Short-term acute exposure to PCE can cause dizziness, headaches, unconsciousness, and even death. PCE can be toxic to the central nervous system, kidney, liver, reproductive system, and developing fetuses.

42. TCE is a carcinogen that may cause kidney cancer, liver cancer, and malignant lymphoma. Short-term exposure to high concentrations of TCE can cause dizziness, headaches, lack of coordination, unconsciousness, liver damage, possible kidney damage, and even death.

---

for hazardous substances in environmental media, including surface water, groundwater, soil, and sediment. The guidance levels set limits designed to protect human health and the environment. DEC guidance levels and other criteria applicable at the time of the environmental investigations and as discussed in this Complaint have, for the most part, been replaced by codified regulatory limits.

43. Short-term exposure to high concentrations of 1,2-DCE can cause nausea, drowsiness, and even death.

44. The remedial investigation recommended that the groundwater in the vicinity of the Site also be tested to determine if the hazardous substances contamination was limited to soils or was also present in the groundwater.

45. In September 2017, TRC Companies, at the direction of DEC, completed a groundwater investigation to determine the presence or absence of hazardous substances in the groundwater at the Site. The investigation found that elevated levels of TCE, PCE, and 1,2 DCE were present in the groundwater on-Site—up to 224 ppm total (170 ppm TCE), resulting in significant groundwater contamination. Those levels are consistent with TCE being present in a separate, heavier than water, phase (i.e., undissolved product), also known as a dense non-aqueous phase liquid (DNAPL). DNAPL acts as a continuing source of contamination as the DNAPL slowly dissolves into passing groundwater.

46. In September 2019, DEC investigated subsurface and groundwater conditions near the area of contamination at the Site to identify any potential migration pathways from the source area. DEC's investigation identified a significant groundwater plume migrating from the source area northwest towards neighboring properties.

47. Regarding soil vapor contamination, the remedial investigation found that the same hazardous substances identified in the soil samples at the Site were also present in the air samples collected from the off-Site soil over the groundwater

plume, which indicates that the hazardous substances contaminating the Site soils are volatizing or evaporating from the soils and entering the atmosphere and interiors of structures at the Site and adjacent properties.

48. With regard to indoor air contamination from soil vapor entering or intruding into structures on the Site and on adjacent parcels, indoor air samples collected from these properties contained hazardous substances consistent with those found in the soils of the Site.

49. All the above types of contamination are consistent with the location where dry-cleaning operations were conducted at the Site, the solvents used during such operations, and the migration of such contamination to adjacent and abutting properties.

50. DEC determined in the remedial investigation that the potential for human contact with contamination exists through direct contact with soil below the surface during activities such as utility maintenance, both on-Site and off-Site. DEC also determined that human beings were exposed to contamination as a result of indoor air contamination.

51. DEC concluded that significant groundwater contamination continued to migrate northwest and that, left untreated, the suspected DNAPL pool would continue to dissolve into groundwater, causing high levels of VOC throughout the aquifer. Therefore, DEC determined that remediation of the groundwater and aquifer is necessary to protect human health and the environment.

52. The DEC placed the Site on the Registry of Inactive Hazardous Waste Disposal Site (Registry) and classified it as a Class 2 site, indicating that the Site poses a significant threat to the public health or environment and remedial action is required, effective July 20, 2016. The DEC anticipates spending public funds to remediate contamination pursuant to ECL Art 27 Titles 13 & 71 and NYS Finance Law §97-b.

53. Since the DEC remedial investigation is on-going, DEC has not issued a feasibility study report for the Site and other affected parcels and structures.

### DEC's Identification of Potentially Responsible Parties (PRPs) Under CERCLA

54. As a result of a review of records related to ownership and operations at the Site, on July 5, 2016, DEC sent a written Notice of Intent to counsel for Fashion Care and Ouderkirk RTP that the Site was intended to be listed in the "Registry of Inactive Hazardous Waste Disposal Sites in New York State" as a "Class 2" site.

55. As a result of its on-going remedial investigation, on July 5, 2016 DEC sent written notice to the counsels for New Fashion, Fashion Care, and Ouderkirk RTP that their clients were potentially responsible under CERCLA for clean up costs at the Site (PRP Notices).

56. On September 7, 2016, PRP Notices were again sent to counsel for New Fashion, Fashion Care, and Ouderkirk RTP.

57. By letter dated July 28, 2016, counsel for New Fashion advised that New Fashion declined to enter into an order to finance a remediation program.

New Fashion affirmatively denied PRP liability for its operations, in that New Fashion has not contributed to or otherwise caused or aggravated the contaminants at the Site.

58.  DEC entered a cash-out Order on Consent and Administrative Settlement with Fashion Care, and Peter Arnos and Ednamae Arnos (Index No. R4-2016-0523-99) with an effective date of June 23, 2017. Consistent with the Order on Consent and Administrative Settlement, the DEC received a single cash payment of $30,000 on behalf of Peter Arnos, Ednamae Arnos, and Fashion Care.

### State Response Actions and Costs Incurred

59.  DEC has approved the use of the "hazardous waste remedial fund," also known as the State Superfund, for responding to the releases of hazardous substances. The Site was approved for referral to the State Superfund program for the development and implementation of a state-funded remedial program.

60.  As of December 23, 2020, the State had incurred costs of approximately $755,431.75 for personnel costs and contract payments for its remedial investigation of the release and threatened release of hazardous substances at the Site. The cost components are: $700,796.42 for the remedial investigation activities to delineate soil, groundwater and soil vapor contamination emanating from the superfund site under contract; $54,635.33 for DEC personnel services, together with costs of $9,836.35 incurred by the Department of Health less $30,000 recovered under the terms of the Consent Order (Index No.R4-2016-0523-99). Total unreimbursed costs are $735,268.10.

61. The response actions that the State has taken and will take to respond to the release of hazardous substances at the Site are consistent with the "national contingency plan," 40 C.F.R. Part 300.

## CLAIM FOR RELIEF
## COST RECOVERY UNDER CERCLA

62. The State hereby incorporates by reference the allegations above as if fully set forth herein.

63. The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

64. Buildings, structures, and equipment where hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Site are also "facilities" under 42 U.S.C. § 9601(9).

65. There have been "releases" or threatened "releases" of "hazardous substances," as those terms are defined in 42 U.S.C. §§ 9601(14) and (22), at and from the Site and other facilities at the Site into the environment.

66. Among the hazardous substances that were released and are threatened to be released into the environment at and from the Site and other facilities at the Site are PCE, TCE, 1,2-DCE, and vinyl chloride.

67. PCE, TCE, and other VOC contaminated the "environment" within the meaning of 42 U.S.C. § 9601(8).

68. The State has incurred costs, and will continue to incur costs, to "respond," as that term is defined in 42 U.S.C. § 9601(25), to the release and threatened release of PCE, TCE, and other VOC from the Site, including costs to assess, monitor, evaluate, oversee, and conduct "removal actions" and/or "remedial

actions," as those terms are defined in 42 U.S.C. §§ 9601(23) and 9601(24).

69.   42 U.S.C. § 9607(a) provides that: (i) persons who are current owners or operators of a facility and (ii) persons who were owners or operators at the time that hazardous substances were disposed, shall be liable for the costs of removal and remedial actions that are "not inconsistent with the national contingency plan."

70.   The State will undertake removal and remedial actions at the Site consistent with the national contingency plan.

71.   Defendant is a "person" within the meaning of 42 U.S.C. § 9601(21).

72.   Ouderkirk RTP owned the Site when hazardous substances were disposed and thus were owners of the Site and other facilities at the Site at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

73.   Pursuant to 42 U.S.C. § 9607(a), Ouderkirk RTP is strictly, and jointly and severally, liable to the State for past response costs incurred by the State as a result of the release or threatened release of hazardous substances at and from the Site and other facilities at the Site.

74.   Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g), Ouderkirk RTP is strictly, and jointly and severally, liable for future response costs incurred by the State as a result of the release or threatened release of hazardous substances at and from the Site and other facilities at the Site.

## PRAYER FOR RELIEF

WHEREFORE, the State requests judgment in its favor and against

defendant Ouderkirk RTP, upon the claim set forth above, and requests that this Honorable Court enter judgment against Ouderkirk RTP, as follows:

1. Declaring Ouderkirk RTP to be strictly, and jointly and severally, liable to the State under CERCLA for, and awarding to the State, all costs and expenses, including interest, attorneys' fees, and other costs of enforcement incurred by the State in responding to the release or threat of release of hazardous substances at and from the Site and other facilities at the Site.

2. Declaring Ouderkirk RTP to be strictly, and jointly and severally, liable to the State under CERCLA for all future response costs and expenses, including interest, attorneys' fees, and other costs of enforcement to be incurred by the State in responding to the release or threat of release of hazardous substances at and from the Site and other facilities at the Site.

3. Ordering such other and further relief, in law or in equity, as the Court deems just and proper.

Dated:   March 22, 2021
         Albany, New York

                              LETITIA JAMES
                              Attorney General of the State of New York
                              *Attorney for Plaintiffs*

By: _____
      Stephen M. Nagle
      Assistant Attorney General
      Environmental Protection Bureau
      The Capitol
      Albany, New York 12224-0341
      (518) 776-2400
      Stephen.Nagle@ag.ny.gov